UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. 12-40092-01-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER GRANTING MOTION |
| | ) | TO SUPPRESS |
| JUAN LOZANO MUNOZ, | ) | |
| | ) | |
| Defendant. | ) | |

**NATURE AND PROCEDURE OF THE CASE**

Defendant, Juan Lozano Munoz, is charged with illegal reentry after deportation. Munoz has moved to suppress all evidence and statements obtained by authorities as a result of a traffic stop of a vehicle in which Munoz was a passenger. The motion was referred to a magistrate judge for the purpose of holding an evidentiary hearing.

On October 4, 2012, an evidentiary hearing was held before the magistrate judge. During the course of the hearing, the magistrate judge received testimony from John Badker, the police officer who investigated the matter, and Charla Aramayo, an agent with the Department of Homeland Security. The magistrate judge also received a DVD recording of the traffic stop and Officer Badker's written incident report. Based upon the testimony and exhibits received at the hearing, the magistrate judge issued a Report and Recommendation recommending denial of the motion to suppress because all of the evidence and statements obtained by authorities as a result of the traffic

stop were within the proper scope of the stop and did not unreasonably prolong the stop. Munoz now objects.

## STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 636(b)(1)(C), the court makes a de novo review "of those portions of the [magistrate judge's] report or specified proposed findings or recommendations to which objection is made." *See also Thomas v. Arn*, 474 U.S. 140 (1985).

## FACTS

Munoz makes six objections to the facts as set forth by the magistrate judge in the Report and Recommendation. The court generally agrees with Munoz's objections and recites the pertinent facts as follows:

At about 10:20 p.m. on July 31, 2012, Officer Badker of the Mitchell Police Department stopped a vehicle for a traffic violation because the vehicle had a burned out taillight. There were three individuals in the vehicle, Munoz being a passenger in the back seat.

After approaching the vehicle and informing the driver of the reason for being stopped, Officer Badker asked the driver for his license and where the individuals were headed. The driver informed Officer Badker that they were headed to a motel, that they were from Omaha, and that they were in Mitchell for work as part of a roofing crew. The driver informed the officer that he did not possess a driver's license and instead provided him with a Mexican ID

card.[1] Upon receiving the driver's Mexican ID card, Officer Badker asked Munoz and the other passenger for their "papers." The other passenger turned over a Honduran birth certificate, and Munoz attempted to give the officer a phone bill that included Munoz's identification. Officer Badker refused to look at the phone bill. At this point in Officer Badker's police report, he notes that "[n]one of the males had a passport or any other paperwork to prove that they were not illegal immigrants." Ex. A at 3.

Officer Badker next asked for vehicle registration and proof of insurance as well as for the driver to exit the vehicle. The driver complied with all requests, and he and the officer entered the patrol car. Once in the patrol car, Officer Badker had dispatch check the names of the three individuals in the vehicle to ensure that there were no warrants out for their arrests; no warrants were found.

While in the patrol car, the driver informed Officer Badker that the vehicle belonged to his employer and provided the officer his supervisor's name and phone number. He also told the officer that he was in the United States legally. Dispatch confirmed that the vehicle belonged to the person identified by the driver. Even though dispatch confirmed that the vehicle was not reported stolen, the officer proceeded to call the driver's supervisor. The supervisor

---

[1] According to the DVD video of the stop, from this point until the end of the stop, nearly all of Officer Badker's efforts were spent investigating whether the three individuals were legally in the United States.

confirmed that the individuals had permission to use the vehicle.[2] The majority of this phone conversation, however, pertained to whether the driver was in the United States legally. Apparently unsatisfied with the supervisor's responses, Officer Badker called a different person within the company. This conversation also dealt mostly with whether the driver was an illegal immigrant. Neither individual informed Officer Badker that the driver, or the other passengers, were illegal aliens. The officer then called the driver's wife and interrogated her over the phone. The wife corroborated what the driver and the two supervisors had already told the officer.

At this point in the police report, Officer Badker notes that he called Immigration and Customs Enforcement (ICE) because he believed that all three individuals were illegal immigrants.[3] In an initial phone conversation with ICE agent Aramayo, Officer Badker provided her with the driver's name as well as the other passenger's name. He then ended the phone conversation with Aramayo so that he could go back to the vehicle to retrieve the name of Munoz. After Munoz wrote his name and date of birth on a piece of paper, Officer Badker returned to the patrol car and called Aramayo so that he could relay Munoz's name to her. At this point in time, Officer Badker testified that the only thing he knew about Munoz was that "he was a passenger in the back seat

---

[2] This was seventeen minutes into the stop.

[3] Officer Badker did not provide a reason why this suspicion existed either in his police report or his testimony.

of the vehicle that was stopped, obviously, for a valid violation and that the driver of the vehicle did not have a driver's license and could not give me any ID to confirm that he was here legally." Docket 27 at 41.

Aramayo then informed Officer Badker that the driver was here legally but the other two passengers were illegal aliens.[4] Aramayo asked Officer Badker to detain the two passengers until she was able to travel to Mitchell. Officer Badker complied with Aramayo's request and detained Munoz and the other passenger.

**DISCUSSION**

Munoz argues that Officer Badker's investigation was not a proper expansion of the traffic stop and that his detention was extended without reasonable suspicion. Therefore, all evidence and statements obtained during such detention were obtained improperly and should be suppressed.

The parties agree that the initial traffic stop was valid. Thus, Officer Badker was within his authority to conduct a reasonable investigation. *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994). "A reasonable investigation includes asking for the driver's license, the vehicle's registration, as well as inquiring about the occupants' destination, route, and purpose." *United States v. Munroe*, 143 F.3d 1113, 1116 (8th Cir. 1998). "An officer may also question a vehicle's passengers to verify information provided by the driver, and conflicting stories may provide justification to expand the scope of

---

[4] This conversation reportedly took place at 11:33 p.m.

5

the stop and detain the occupants." *United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004). An officer can ask the passengers to produce identification. *United States v. Rodriguez-Hernandez*, 353 F.3d 632, 635 (8th Cir. 2003); *see also Muehler v. Mena*, 544 U.S. 93, 101 (2005) (finding that an officer can ask someone who is detained his name, date and place of birth, and immigration status so long as the detention was not prolonged by the questioning).

"An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) (citing *Bloomfield*, 40 F.3d at 916). Unless there is a "reasonably articulable suspicion for believing that criminal activity [is] afoot, continued detention" following the complete processing of the traffic violation is unreasonable. *United States v. Beck*, 140 F.3d 1129, 1134 (8th Cir. 1998). Answers to routine questions "may arouse suspicion that other criminal activity is afoot, in which case the officer may ask additional questions to verify or dispel his suspicion." *United States v. Yang*, 345 F.3d 650, 655 (8th Cir. 2003).

Here, there is no question that the detention of Munoz was prolonged by Officer Badker's investigation into his immigration status. During the evidentiary hearing, Officer Badker testified that there was a point during the stop in which the only reason he was detaining the passengers was to check their immigration status. Docket 27 at 37, 39. Also, Officer Badker learned early on in the stop, *i.e.*, seventeen minutes into the stop, that none of the

6

passengers had a driver's license and that they had permission to drive the vehicle they were occupying. *See* Docket 30 at 4 (noting that Officer Badker spoke with the driver's supervisor at 22:37, seventeen minutes after the initial stop, and during this conversation he confirmed that the passengers were in legal possession of the vehicle). Thus, Officer Badker's remaining investigation, which took nearly an hour, was solely for the purpose of determining the passengers' immigration statuses. Therefore, the issue is whether Officer Badker had a reasonable suspicion for believing that the passengers were illegal immigrants so as to justify his detention of them for the sole purpose of completing his immigration investigation. *See Beck*, 140 F.3d at 1134 (requiring a reasonable suspicion of criminal activity to prolong a detention).

"Reasonable suspicion requires that the officer's suspicion be based upon particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *United States v. Lopez-Mendoza*, 601 F.3d 861, 865 (8th Cir. 2010). Whether an officer has a reasonable suspicion is determined by examining the totality of the circumstances. *United States v. Morgan*, 270 F.3d 625, 630 (8th Cir. 2001).

The Report and Recommendation concluded that Officer Badker had reasonable suspicion to investigate the immigration statuses of the passengers. Docket 30 at 7-8. The basis for this finding stems from the fact that Officer Badker was "met with an inability from any occupant of the vehicle to comply

7

with [a request for identification]," "[n]one of the men spoke much English, the truck they were occupying was not registered to any of them, and none of them could produce any proof of legal presence in the United States." Docket 30 at 8. The Report and Recommendation determined that "[g]iven this state of affairs, and that 8 U.S.C. Section 1304(e) requires all legal aliens to carry their alien registration paperwork with them at all times," Officer Badker had a reasonable suspicion to investigate their immigration statuses. *Id.*

As an initial matter, the Report and Recommendation's conclusion that the passengers were unable to comply with Officer Badker's request for identification is inaccurate. In fact, the driver produced a Mexican ID card, another passenger produced a Honduran birth certificate, and Munoz produced a phone bill. Docket 27 at 22. None of these documents indicated that the passengers could legally drive a vehicle, but they were nonetheless "identifications" in a general sense. The magistrate judge's recommendation implicitly concludes that by "identification," the passengers were required to produce either a valid driver's license or some proof of legal presence in the United States. The court, however, is unaware of any federal or South Dakota law that requires a passenger in an automobile to carry a valid driver's license or some other document that shows proof of legal presence in the United States. It is true that the driver of a vehicle is required to carry a valid driver's license in South Dakota. SDCL 32-12-22. But this does not simultaneously require a passenger to carry a valid driver's license. Thus, Munoz's inability to

8

produce a driver's license or a document that shows proof of legal presence in the United States does not give rise to a reasonable suspicion that Munoz was an illegal immigrant.

Next, the Report and Recommendation based its conclusion, in part, on the fact that "[n]one of the men spoke much English." Docket 30 at 8. This statement is not entirely accurate. As the DVD video illustrates, Officer Badker was able to communicate effectively with the driver of the vehicle in English. Separately, the court is unaware of any affirmative requirement that a passenger in an automobile be able to speak fluent English. Therefore, the fact that Munoz spoke "broken English," Docket 27 at 41, does not produce a reasonable suspicion that he is an illegal immigrant. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 886 (1975) (being of Mexican descent, alone, does not justify a reasonable belief that he or she is an alien).

The Report and Recommendation also relies on the fact that the vehicle was not registered to any of the passengers. Such a fact would provide a reasonable suspicion to investigate whether the vehicle was stolen, and indeed, Officer Badker performed such an investigation. As discussed above, he confirmed that the vehicle was not stolen within the first seventeen minutes of the stop. Being a passenger in a vehicle that is not registered to any occupant does not create a reasonable suspicion that would allow for an additional hour-long investigation into said passenger's immigration status, especially when it has been confirmed that the occupants have permission to use such vehicle.

9

Examining each individual factor by itself is not enough. The court must examine the totality of the circumstances. *Morgan*, 270 F.3d at 630. As noted above, Officer Badker knew within the first seventeen minutes of the stop that the vehicle had a broken taillight, that no passenger had a valid driver's license that would allow them to continue driving the vehicle, and that the vehicle was not stolen. Officer Badker did not testify that Munoz or the other occupants appeared nervous. Officer Badker was never given a fake document for purposes of identification by any of the occupants. There were no inconsistencies in the conversations that Officer Badker had with each occupant, the occupants' two supervisors, or the driver's wife. None of these individuals made any statement to suggest that Munoz was an illegal alien. In fact, Officer Badker testified that the only thing he knew about Munoz prior to Aramayo's telling him that Munoz was here illegally was that "he was a passenger in the back seat of the vehicle that was stopped, obviously, for a valid violation and that the driver of the vehicle did not have a driver's license and could not give me any ID to confirm that he was here legally." Docket 27 at 41. Therefore, when examining the totality of the circumstances, the court finds that Officer Badker did not have a reasonable suspicion to prolong the traffic stop for purposes of investigating Munoz's immigration status.

The magistrate judge also relies on the duty created by 8 U.S.C. § 1304(e), requiring all legal aliens to carry their alien registration paperwork with them at all time. Reliance on this statute, however, is misplaced. If Officer

Badker's reasonable suspicion was created because of this statute, he would have needed to know that Munoz was an alien. But there is no indication that Officer Badker had such knowledge. In fact, the investigation that is the basis for this motion was directed at determining that very question—whether Munoz was an alien. The final conclusion that Munoz was an alien cannot be what provides the reasonable suspicion necessary to draw such a conclusion.

Lastly, it is well settled that "[e]vidence should not be excluded from trial based on a constitutional violation unless the illegality is at least a but-for cause of obtaining the evidence." *United States v. Olivera-Mendez*, 484 F.3d 505, 511 (8th Cir. 2007). There is no doubt here that the illegality of the search was the but-for cause of obtaining the incriminating evidence. The clearest illustration of this is found in Officer Badker's own testimony, in which he said that the only thing he knew about Munoz prior to Aramayo's telling him that Munoz was here illegally was that "he was a passenger in the back seat of the vehicle that was stopped, obviously, for a valid violation and that the driver of the vehicle did not have a driver's license and could not give me any ID to confirm that he was here legally." Docket 27 at 41. If the illegal search had not taken place, Officer Badker would not have obtained any incriminating evidence. Thus, the illegality was the but-for cause of obtaining the evidence. Further, the but-for cause here was not attenuated whatsoever to purge any taint of the illegality as warned of in *Hudson v. Michigan*, 547 U.S. 586, 592 (2006).

In summary, the court finds that Officer Badker did not have a reasonable suspicion to believe that Munoz was an illegal alien. Therefore, the continued detention of Munoz for the sole purpose of investigating his immigration status was unreasonable. Accordingly, it is

ORDERED that the Report and Recommendation of the magistrate judge (Docket 30) is rejected and defendant's motion to suppress (Docket 22) is granted.

Dated December 3, 2012.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE